RICHARD D. BOKUM II AND MARGARET B. BOKUM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bokum v. Commissioner
Docket No. 6352-75
United States Tax Court
T.C. Memo 1990-21; 1990 Tax Ct. Memo LEXIS 21; 58 T.C.M. (CCH) 1183; T.C.M. (RIA) 90021; January 11, 1990
Richard C. Conover, for the petitioners. W. Scott Green and Jay M. Erickson, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent *23 determined a deficiency of $ 2,570,061.99 in petitioners' Federal income taxes for 1971. The deficiency resulted from disallowance of a claimed partnership loss in the amount of $ 4,202,345 arising out of a limited partnership in which Richard D. Bokum had an interest. The issues for decision are (1) whether the statutory notice of deficiency was valid; (2) whether the burden of proof is on petitioners or on respondent; (3) whether equitable estoppel bars assessment of the deficiency; (4) whether Margaret Bokum is entitled to relief as an innocent spouse; and (5) whether petitioners are entitled to deduct any portion of the claimed loss. Respondent has conceded that petitioners are entitled to deductions "in order that the adjustments be consistent with final outcome in Brountas," i.e., Brountas v. Commissioner, 73 T.C. 491 (1979), revd. and remanded 692 F.2d 152 (1st Cir. 1982), and sub nom. CRC Corp. v. Commissioner, 693 F.2d 281 (3d Cir. 1982). Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules *24 of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Other facts are admitted by petitioners' response to respondent's request for admissions. Petitioners were residents of Florida at the time they filed their petition. Substantive Background
In 1971, Richard D. Bokum (petitioner) was seeking an investment for funds received on the liquidation of a company known as Bokum Corporation. Petitioner was interested in oil and gas properties. In a meeting with Louis Diamond (Diamond), a tax attorney, petitioner was told about an entity known as Comprehensive Resources Corporation (CRC). CRC was engaged primarily in organizing and managing tax sheltered oil and gas exploration programs for investors. The CRC programs were organized as limited partnerships, with CRC or one of its subsidiaries, such as GeoDynamics Oil and Gas, Inc. (GeoDynamics), acting as general partner. The format of the programs was conceived by Milton A. Dauber (Dauber) and William J. Soter. An oil and gas operator is a company that employs geologists who locate oil and gas prospects. A prospect *25 is a geographical area beneath the surface where oil and gas reserves may exist in commercial quantities. Having geologically determined the location of a prospect, an operator attempts to obtain a legal interest in the oil and gas rights in order to enable the operator to have a test well drilled on the prospect. An operator makes money from its equity interest in reserves discovered on prospects originated by the operator's geologists, not by acquisition or resale of leasehold interests or from the contract drilling of test wells. After entering into arrangements with outside investors for the drilling of a test well on one of its prospects, the operator is responsible for overseeing the actual drilling of a test well, the completion of the well, if attempted, and the production and operation of the well, if reserves in commercial quantities are discovered. An operator does not normally own its own drilling equipment. To accomplish the actual drilling of a well, an operator engages a drilling contractor who owns such equipment. The contracts between the drilling contractor and the operator may be either for a total fixed fee, which is known as a turnkey contract, or for a *26 fixed fee per day or per foot to a specified depth. In determining what price to charge investors for drilling of a test well, an operator takes into consideration the amount it will cost to hire drilling contractors and evaluates the risk, if any, of encountering difficulties in getting the particular test well drilled. During 1971, CRC and its subsidiaries (hereinafter collectively referred to as CRC) entered into various agreements with different operators on behalf of limited partnerships in which CRC was a general partner. The transactions that CRC and the limited partnerships entered into, as well as the documentation of those transactions, were standardized to a significant degree. The standard package consisted of five agreements. The agreements generally consisted of (1) a lease purchase and turnkey drilling agreement, (2) a loan agreement, (3) a promissory note, (4) a mortgage, deed of trust, and assignment of security interest, and (5) a joint venture agreement, which would pertain to a "package of prospects" involving two or more noncontiguous oil and gas prospects to be drilled by a single operation. Each limited partnership invested in several such packages, receiving *27 a percentage in each, in order to obtain diversification. Among the agreements in the package was a loan agreement expressly providing that the borrower partnership had no personal liability for any loan or advance made pursuant thereto and that there was no recourse against the borrower "or any partner of the borrower, whether general or limited" on any of the indebtedness created under the loan agreement. The only recourse that the operator had against the borrower on the note was the collateral set forth in a security agreement. The entire principal amount of the loan and accrued interest were payable out of the oil and gas production from, or out of the sale of, any and all leaseholds or other rights and property interests subject to a mortgage; the principal and accrued interest were not selectively payable out of the oil and gas produced from, or proceeds from the sale of, each leasehold in proportion to the loan proceeds used in the acquisition of drilling. As compensation for their services as general partners, CRC or its subsidiaries received management fees and the right to reversionary interests in the net operating profits of each leasehold interest to be acquired *28 by the partnerships. The management fee received by the general partner was 9 percent of the amount contracted by the limited partnership for the leasehold acquisitions and the drilling of the test wells, which included the portion of the contract price obtained through nonrecourse financing. Petitioner reviewed the CRC programs with his tax counsel and with a geologist employed by petitioner. Petitioner requested and received various representations about the tax advantages of the CRC program. For example, his geologist, Bowman Livingston, reported "the investor is allowed the full tax write-off (that amount invested by the investor plus that amount loaned by the operator) as an intangible drilling cost." His tax attorney assured him that Rev. Rul. 71-252, 1971-1 C.B. 146, " permits you to deduct expenses paid and contracted for even though work eg: drilling has not yet been performed at year end." CRC made various representations, specifically adding: 1. The amounts borrowed through nonrecourse loans will be sufficient to produce intangible drilling and development costs during 1971 of twice the amount invested. 2. The amount borrowed will be greater than the *29 amount invested. The amount by which the borrowing will exceed the amount invested will be the non-deductible portion of the 18% fee paid to the general partner. On or about December 7, 1971, petitioner entered into a limited partnership agreement with Special Quinta 1971 Drilling Venture (Quinta). The general partners were CRC and GeoDynamics. Petitioner had an approximate 86.6-percent interest in Quinta during 1971. Quinta had an interest in each prospect identified by number in the following amounts during the year 1971 and part of 1972: Prospect Number
Interest
237
2.91
238
2.91
264 to 273
9.26
274 to 281
9.75
282 to 289
9.75
322
4.70
293
4.78
295
3.52
172
7.05
342
6.85
349
6.85
309
5.56
159
3.42
101
6.85
104
6.85
364 to 369
7.64
410 to 414
7.64
124
.87
388
3.51
421
2.19
422
3.59
299
5.26
387
2.98
426
4.91
209
4.56
480 to 489
10.53
417 to 419
12.30
470 to 478
12.30
441
6.85
451
6.85
232
.70
400
6.85
401
6.85
297
2.98
339
5.71
*30 On its 1971 partnership tax return, Form 1065, Quinta reported deductions as follows: Intangible drilling and
development costs
$ 3,794,065
Interest on nonrecourse notes
4,495
Advance royalties
112,542
Management fees
436,500
Abandonment losses
444,105
On their joint individual income tax return for 1971, petitioners claimed a loss in the amount of $ 4,202,345 as petitioner's distributive share of losses reported by Quinta on its partnership return. As early as February 6, 1973, petitioner was dissatisfied with Quinta and its reporting to him. Petitioner decided that he was not receiving money to which he was entitled from the partnership and employed counsel and auditors to pursue his rights. He was in contact with representatives of Touche Ross, accountants for the partnerships. He made regular trips to New York seeking information. Petitioner paid $ 27,000 to Richard Watkins to go to Corpus Christi, Texas, and review records of the partnership. Petitioner was not satisfied that he was receiving an adequate accounting of the partnership's affairs. In or about 1984, petitioner's partnership interest in Quinta was sold to AdobeOil and Gas. *31 Petitioner thereafter abandoned any attempt to secure information about Quinta's affairs. Respondent's Determination
Petitioners' 1971 return had been filed in the District of New Mexico. S. E. Varela, a revenue agent in Santa Fe, New Mexico, was assigned to examine the 1971 income tax return filed by petitioners. On March 30, 1973, Varela requested that an examination of Quinta be made for 1971. In 1973, revenue agent William Haas (Haas), who was employed in the Philadelphia district of the Internal Revenue Service (IRS), was assigned to audit a group consisting of approximately 52 partnerships and 2,500 partners, known as the "Geo Group." Haas examined various documents in Corpus Christi, Texas, and at the Securities and Exchange Commission (SEC) in Washington, D.C. The documents reviewed by Haas indicated that Quinta was one of the partnerships that were in the Geo Group. Haas was directed to accountants of the firm of Touche Ross for information concerning the partnerships. By May 1974, a computer operation had been established by the IRS in Fresno, California, for the purposes of sending out a Form 918-A to notify all other IRS districts in which taxpayers who *32 were limited partners in the Geo Group resided that an audit was being conducted with respect to the group. On or about January 16, 1975, the office of the New Mexico district of the IRS sent a letter to petitioners as follows: We are examining the Federal tax return of * * * [Special Quinta 1971 Drill Venture], in which you have an interest. This may affect your tax liability, but we do not know when our examination will be completed. Because the limitation period prescribed by law for assessing any additional tax due on your return will expire soon, we would appreciate your extending this period by signing all copies of the enclosed forms and returning them within 10 days from the date of this letter. A self-addressed envelope is enclosed for your convenience. After the signed consent forms are accepted, we will return a copy for your records. Extending the limitation period will give you and the Internal Revenue Service the time needed to properly consider any questions or issues that my arise during the examination. Thank you for your cooperation. Follow-up letters were sent to petitioners on February 21, 1975, and March 28, 1975. On or about April 4, 1975, Haas *33 sent a memorandum to M. Gallegos, Chief, Review, in the New Mexico district as follows: subject: Special Quinta 1971 Drilling Fund Pursuant to your phone call requesting "direction" regarding statutory notice issuance to a limited partner, R. Bokum (Social Security number * * *) we submit the following: 1. Our Report on Special Quinta should be finalized by the end of May '75. However our "final" adjustments will not be issued to the Districts until such time as our case "clears" Appellate. (It now appears that the taxpayer will take the case to court). 2. Our final adjustments should approximate at least 3/4 of the partnership's loss. 3. However, in order to best protect the government's interests, if the taxpayer will not extend the statute, 100% of each limited partner's loss should be disallowed. If you have any further questions, please do not hesitate to contact me * * *. The notice of deficiency for 1971 was sent to petitioners on April 10, 1975. The explanation attached to the notice stated: (a) It is determined from examination of the Special Quinta 1971 Drilling Venture, a partnership in which you hold an interest, that there was no loss sustained *34 in the year 1971. Accordingly, the partnership loss claimed on your return for the taxable year 1971 is disallowed in full. Petitioner deliberately refused to extend the period of limitations for 1971 when requested by respondent, knowing that respondent would be forced to send a notice of deficiency. Petitioner's attitude was as set forth in a letter he wrote to the IRS dated April 18, 1975, as follows: I received your Notice of Deficiency for $ 2,570,061.99 for the tax year ended December 31, 1971. In the early part of April I received a call from Mr. Johnson asking me to waive the statute of limitations as the Internal Revenue Service had not completed an audit of the Special Quinta 1971 Drilling Venture. I refused to extend such time period because your department had three years to have made and completed such an audit. It states in your letter of deficiency that from an examination of the Special Quinta 1971 Drilling Venture you have determined no loss was sustained in 1971. My question to you is how did you make such a determination if you haven't completed the audit. This is the kind of abusive power that people in this country are sick of. I am, of course, going *35 to answer your letter within ninety (90) days and either appeal your decision in a Federal Tax Court or a Federal District Court. During his work on the partnership, Haas developed various theories for disallowing in full the differing items of loss claimed by the partnership. The National Office of the IRS, however, gave priority to attacking the inclusion of nonrecourse loans in a partner's basis in oil and gas industry partnership ventures. When the adjustments were finalized for the various Geo Group partnerships, certain deductions were allowed to the partnership that were not reflected in the statutory notice of deficiency sent to petitioners. The disallowed deductions shown on a Form 1065 Adjusted Report dated August 28, 1975, with respect to Quinta were as follows: 5. Adjustment to ordinary income
Tax year 71
a. Non Recourse Loan (IDC)
$ 2,161,253
b. Non Recourse Loan
(Abandonment)
266,463
c. Pre-Paid IDC
1,142,968
Further details of the adjustments were explained in that report. OPINION Procedural History
The age and issues of this case call for a detailed explanation of events that have occurred over the *36 14 years that it has been pending. The petition was filed July 8, 1975, by Diamond as counsel for petitioners. Petitioners did not designate a place of trial. At the time the answer was filed, respondent designated Albuquerque, New Mexico, for trial. On November 26, 1975, petitioners filed a Motion to Change Place of Trial, stating: 1. The books and records of Special Quinta 1971 Drilling Venture, which are the primary documents relevant herein, are located in Corpus Christi, Texas. These records are voluminous. 2. Most of the witnesses who are familiar with the subject matter of this case are located in or around Corpus Christi, Texas. Travel to Albuquerque, New Mexico, would cause unnecessary expense and inconvenience. The motion was granted January 15, 1976. In 1976, 1977, and 1978, many cases were filed in which taxpayers challenged respondent's disallowance of their partnership losses reported from oil and gas drilling partnerships in which CRC was a general partner. Such cases were assigned as a group to Judge Cynthia H. Hall. In a pretrial conference held December 16, 1977, Brountas v. Commissioner was selected as a limited partner test case for the *37 group. One of the issues raised at the pretrial conference was the taxpayers' contention that the usual presumption of correctness did not attach to the statutory notices sent to the partners, and, therefore, respondent should bear the burden of proof because of the Commissioner's alleged failure to follow proper procedures. On January 30, 1978, an order was issued in this case by the Chief Judge as follows: It appearing to the Court that this case is related to the case of Paul P. Brountas and Lynn T. Brountas, Docket No. 8231-76 which case has been assigned to Judge Cynthia Holcomb Hall it is ORDERED that this case is also assigned to Judge Cynthia Holcomb Hall for trial or other disposition. On December 26, 1979, an opinion was filed in Brountas v. Commissioner, and related cases, as 73 T.C. 491 (1979). The issues decided were as follows: (1) Whether the partners were entitled to deductions for intangible drilling and development costs in excess of the amount of cash spent. (a) Whether the nonrecourse notes were shams. (b) If the nonrecourse notes were not shams, whether the taxpayers were entitled to include the notes in their bases in their *38 partnership interests. (c) If the nonrecourse notes provide bases, the amount of the intangible development and drilling costs that the partners were entitled to deduct. (2) Whether the partners were entitled to interest deductions relating to interest paid on the nonrecourse notes. (3) Whether the partners were entitled to claimed deductions for advanced royalties. (4) Whether certain partners were entitled to deductions for management fees paid to the general partners, of which CRC was one. (5) Whether partners are entitled to claimed deductions for abandonment losses. Other issues decided in Brountas are not involved in this case. The five issues specified above, however, were common to all of the partnerships identified as part of the group assigned to Judge Hall, including the Quinta partnership in which petitioner was a limited partner. The opinion in Brountas, among other things, held that the nonrecourse notes had value and commercial reality and were not shams. The Court further held that the nonrecourse notes constituted oil or gas payments or the substantial economic equivalent within the meaning of section 636 and section 1.636-3(a)(2), Income Tax *39 Regs., and were therefore to be treated for tax purposes as loans from the lender or operator to the purchasers. This Court concluded that the face amount of the notes was fully includable, in the case of partnership purchases, in the basis of the partners' partnership interests, as liabilities under section 752, despite the contingent nature of the obligations. The Court held that the partnerships were entitled to some of the deductions claimed for intangible drilling and development costs, interest, and some of the management fees. Decision in the case, however, was delayed pending further briefing and resolution of other issues. On November 23, 1981, the Commissioner of Internal Revenue filed appeals from the decisions in the cases consolidated in Brountas to the Courts of Appeals for the First and Third Circuits. On December 10, 1981, the taxpayers filed cross appeals. On September 28, 1982, the Court of Appeals for the First Circuit, in Brountas v. Commissioner, 692 F.2d 152 (1st Cir. 1982), affirmed the Tax Court's disallowance of some of the deductions claimed by the taxpayers and reversed the Tax Court's determination with respect to inclusion of *40 the nonrecourse notes in basis. On November 16, 1982, the Court of Appeals for the Third Circuit reached the same conclusion in CRC Corp. v. Commissioner, 693 F.2d 281 (3d Cir. 1982). Thus the cases were remanded to this Court for further proceedings. The within case and others involving Geo Group partnerships had been held in abeyance pending resolution of the Brountas cases on appeal. Substantially all of the remaining cases proceeded to resolution by settlement. On November 7, 1984, Burton J. Haynes entered his appearance for petitioners in this case. On February 12, 1985, a Motion for Leave to Amend Petition and Proposed Amendment were filed. That motion alleged that Mrs. Bokum was an innocent spouse under legislation that first became effective July 18, 1984. The motion further alleged: 3. The need to claim innocent spouse status only became apparent after a basis for settlement was reached as to the substantive tax issues in this case. The proposed settlement would result in a tax liability, including accrued interest, estimated at one million five hundred thousand dollars. The motion to amend the petition was granted on February 26, 1985. *41 Also on February 12, 1985, petitioners filed a Motion to Change Place of Trial in which petitioners requested that the place of trial be changed from Houston, Texas, to Helena, Montana. That motion alleged: 1. Agreement has been reached as to the underlying substantive tax issues in this case. The petitioners are prepared to enter into a stipulation with the respondent as to the tax liabilities due for the years in question. The only issue which remains to be resolved is the claim of the petitioner, Margaret B. Bokum, that she should be afforded "innocent spouse" protection under section 6013(e) of the Code, as amended by the Tax Reform Act of 1984. * * * 4. Because of the potential serious impact of this case on her, Mrs. Bokum has now retained additional counsel. By having her own counsel in this matter, Mrs. Bokum hopes to protect her interests which, as to the issue of liability for the deficiency, diverge from the interests of her husband. Mrs. Bokum's new attorney, Richard C. Conover, Esquire is located in Bozeman, Montana, the nearest city to Mrs. Bokum's residence. That motion was granted on February 26, 1985. Regular sessions of the Court are held in Helena, *42 Montana, only once a year. In both the Motion for Leave to Amend Petition and Proposed Amendment and the Motion to Change Place of Trial, petitioners relied on similar motions having been granted in a case involving petitioners' liability for other years, docket No. 19755-83. On July 8, 1986, a Motion of Counsel to Withdraw was filed by Burton J. Haynes, Louis H. Diamond, and Lionel E. Pashkoff. That motion stated: 1. Louis H. Diamond, a member of this firm and its predecessor, Danzansky, Dickey, Tydings, Quint and Gordon, has represented the Petitioners for many years. In 1971, Mr. Diamond provided tax advice to Richard C. Bokum in connection with Mr. Bokum's decision to invest in Special Quinta 1971 Drilling Venture, a limited partnership engaged in the business of oil and gas exploration and development. The deductions claimed by the Petitioners related to Special Quinta 1971 Drilling Venture were disallowed by the Respondent, and such disallowance is the basis of the above-captioned case. 2. By letter dated May 21, 1986 * * *, and while the undersigned counsel was actively engaging in settlement discussions with counsel for the Respondent and otherwise preparing for *43 trial in another case for the Petitioner, Mr. Bokum notified Mr. Diamond that he was considering the bringing of a civil action against this firm, Mr. Diamond and/or Danzansky, Dickey, Tydings, Quint and Gordon for alleged malpractice with regard to the tax advice given to him in connection with Special Quinta 1971 Drilling Venture. We are aware of the fact that Mr. Bokum has consulted another law firm in connection with the commencing of such a suit. The motion to withdraw was granted on July 10, 1986. On January 11, 1987, Respondent's Motion for Order to Show Cause was filed. Respondent's motion alleged in part: 12. As set forth in the attached affidavit, the case before the Court involves losses from Special Quinta 1971 Drilling Venture, claimed by petitioner Richard D. Bokum II as a limited partner on his 1971 joint income tax return. The facts in this case are substantially identical to the facts of the case set forth above. The facts of this case have already been established before this Court in Brountas. To go through this same fact finding process would be burdensome to both the Court and respondent and would further delay the disposition of this ancient *44 case. 13. The petitioners have not responded to respondent's proposals to stipulate the generic facts found by this Court in Brountas . 14. To date settlement negotiations have broken down and it appears the petitioners intend on trying this already decided issue. 15. The petitioners had earlier indicated in one of their motions for change of place of trial that there was an agreement with regard to all substantive issues surrounding the tax shelter in this case, however, since that time petitioners' counsel has withdrawn and petitioners have decided to proceed pro se. Petitioners have now indicated they intend to disregard all previous negotiations and try the case on the tax shelter issue. By Order served January 30, 1987, this case was set for trial in Helena, Montana, on June 29, 1987. On February 5, 1987, Respondent's Motion for Order to Show Cause was granted, and petitioners were ordered to show cause on June 29, 1987, why a judgment should not be entered in this case against petitioners on the tax shelter issue on the basis of Brountas v. Commissioner, supra.
On February 24, 1987, Respondent's First Request for Admissions was filed. In 148 paragraphs, *45 respondent requested petitioners to admit facts concerning the Quinta partnership and the CRC programs. In a Response to Respondent's First Request for Admissions filed April 2, 1987, petitioners admitted certain facts concerning Quinta and CRC but claimed insufficient information to admit or deny others. Also on April 2, 1987, Richard C. Conover entered his appearance on behalf of both petitioners. On May 8, 1987, respondent filed a Motion to Review the Sufficiency of Petitioners' Answers to Respondent's Request for Admissions. Respondent also filed a Motion to Compel Production of Documents. On May 15, 1987, respondent filed a Motion for Protective Order, seeking to avoid responding to petitioners' First Request for Production of Documents and petitioners' Set of Interrogatories served April 17, 1987. On June 11, 1987, petitioners filed a Motion for Summary Judgment and Motion for Attorney Fees, attached to which was an affidavit of petitioner. That motion claimed that the notice of deficiency was void and assessment of petitioners' liability for 1971 was barred by the statute of limitations. Respondent's Objection to Petitioners' Motion for Summary Judgment was filed, *46 and the then pending motions were all heard in Helena, Montana, on June 29, 1987. The motions were taken under advisement, and the parties were permitted to submit additional materials. The Court urged the parties to arrive at a stipulation of facts to be used in the disposition of the motions. On July 31, 1987, respondent filed a Cross Motion for Partial Summary Judgment, requesting that the Court determine that the notice of deficiency was not arbitrarily issued and that petitioners bore the burden of proof. On March 21, 1988, the Court issued a Memorandum Sur Order and an Order discharging the Order to Show Cause, denying petitioners' Motion for Summary Judgment, and setting the remaining motions for hearing in Washington, D.C., on May 23, 1988. After hearing, the Court ordered that certain discovery proceed and denied respondent's Cross Motion for Summary Judgment and respondent's Motion for Protective Order. In a Memorandum Sur Order issued September 1, 1988, the Court explained: A hearing was conducted on the motion at the conclusion of which the Court indicated that it was inclined to deny respondent's motion without prejudice to renew same at or prior to trial. Only *47 a modest amount of discovery has been conducted and, in fact, the record bears out that the parties have not fully cooperated in the discovery process. In such posture, we are not persuaded that partial summary judgment is appropriate at this time and respondent's motion for partial summary judgment will be denied. Our ruling on respondent's motion, however, will have no effect on the burden of proof in this case. The parties shall move forward to trial with the understanding that petitioners retain the burden of proof and persuasion. See Karme v. Commissioner, 673 F.2d 1062 (9th Cir. 1982), affg. 73 T.C. 1163 (1980). It is well established that the burden is always upon the taxpayer to establish the amount of a claimed deduction. Wasie v. Commissioner, 86 T.C. 962 (1986); Chaum v. Commissioner, 69 T.C. 156, 163-164 (1977). By Order dated January 23, 1989, the case was set for trial in Helena, Montana, on June 19, 1989. On February 27, 1989, a Stipulation to Take Deposition of William Haas was filed. The deposition was taken on March 2, 1989. On April 3, 1989, petitioners filed a Motion to Compel Complete Answers *48 to Interrogatories Under Rule 104(d) of the Tax Court Rules of Practice and Procedure. That motion complained of respondent's failure to organize for petitioners' benefit documents produced at the deposition of Haas and complained about other responses to the interrogatories. The interrogatories, however, related solely to respondent's determination in this case and other internal procedures of the IRS, covered thoroughly during the deposition of Haas; the interrogatories were not a bona fide attempt to secure information about the merits of the case and diverted the time of the parties from trial preparation. Petitioners' motion was denied April 10, 1989. On April 24, 1989, respondent filed a Motion for Protective Order, seeking an order relieving respondent of the obligation to respond to interrogatories served by petitioners on March 31, 1989, because they were too close to the trial date. Said interrogatories again related solely to respondent's determination and not to the merits of the case. They were also improper in form. See Pleier v. Commissioner, 92 T.C. 499 (1989). Respondent's Motion for Protective Order was granted April 25, 1989. On April 27, 1989, respondent *49 filed a Motion to Show Cause Why Proposed Facts in Evidence Should Not Be Accepted as Established, in accordance with Rule 91. The proposed stipulation that had been prepared by respondent's counsel set forth various facts concerning Quinta and CRC. The Court ordered a response from petitioners by May 22, 1989, and set respondent's motion for hearing in Washington, D.C., on May 31, 1989. A Second Motion to Show Cause Why Proposed Facts in Evidence Should Not Be Accepted as Established was filed by respondent on May 8, 1989, and was also set for hearing on May 31, 1989. On May 23, 1989, petitioners filed responses to respondent's two motions, but did not set forth any specific objections to any of the matters set forth in respondent's proposed stipulations. In a conference call among the parties and the Court on May 26, 1989, petitioners' counsel requested that hearing on the order to show cause be held telephonically so that he would not be required to travel to Washington, D.C. The Court indicated that petitioners' counsel need not appear, but that, because of the history and complexity of the pending motions, it would be necessary to have a specific argument as to each, which *50 petitioners had not provided, and that it would be necessary to have a written record. The parties were also told to devote themselves to preparing for trial on the merits. Hearing on respondent's motions proceeded in Washington, D.C., on May 31, 1989, and many of the disputed items were resolved by agreement. The Court declined to order petitioners to stipulate to facts concerning the partnership to the extent that those facts were not indisputable. The Court commented, however, on petitioners' apparent self-defeating position in precluding evidence of the transactions entered into by Quinta in view of petitioners' burden of proof. Along with the notices of trial sent in January 1987 and January 1989, the parties were served with the Court's Standing Pre-Trial Order, which referred the parties to Rule 143(f) and directed that a party who intended to call an expert witness was required to serve on the other and submit to the Court a written report of that expert at least 15 days before the trial. Respondent served his expert report in June 1987 and readopted it in June 1989. Petitioners did not submit an expert report at any time. The case proceeded to trial in Helena, Montana, *51 on June 20 and June 21, 1989. Each side strenuously pursued technical objections to evidence offered by the other, each relying on a claim that the other had the burden of proof. Discussion
Throughout these proceedings, petitioners have steadfastly held to their positions that the notice of deficiency was invalid, that respondent should have the burden of proof, and that all of the problems arising out of petitioners' investment in the Quinta limited partnership should be laid at respondent's doorstep, rather than borne by petitioners. Petitioners have resisted every effort of respondent to get into the record in this case information concerning transactions engaged in by Quinta in 1971. For example, certain copies of contracts purportedly entered into by Quinta were provided to Haas when he audited the Geo Group and had previously been provided to petitioners by Quinta. Petitioners in turn provided copies of those same documents to respondent's counsel. Petitioners, however, disclaim any knowledge of whether Quinta actually entered into drilling ventures during 1971 and refused to stipulate to any contracts, preferring to argue authenticity objections that cannot be satisfied *52 because those persons with firsthand knowledge of the transactions are deceased or otherwise unavailable. Another document offered by respondent was found in the SEC files and appears to be authored by Dauber, who is now deceased. The document does not show a signature, and no witness has been presented to explain the context in which it was created. Respondent has been unable to overcome petitioners' objections. Thus petitioners hope to prevent any informed inquiry into the deductibility of amounts claimed on Quinta's 1971 return. Petitioners have repeatedly been warned that they bear the burden of proof. The Court, however, indicated to respondent that in fairness respondent should bear the burden of going forward to the extent that the deductions disallowed in the statutory notice exceeded those ultimately allowed by respondent in the final partnership report. Respondent, therefore, offered evidence to the extent available as to the manner in which the allowed deductions were determined. Respondent also called an expert witness who presented evidence that the oil and gas operations of Quinta did not support the deductions claimed. Petitioners have presented no evidence *53 that they are entitled to any deductions other than petitioner's assertion that he entered the investment to make a profit. Although they offered to call an expert in "rebuttal" of respondent's report, petitioners did not comply with Rule 143(f) or the Court's Standing Pre-Trial Order; their noncompliance was unexcused; the conditions for excuse were not satisfied; and the expert witness was not called after the Court stated that his testimony would be limited. Petitioners also indicated in their trial memorandum that they would call Diamond to testify "as a fact witness as to Mr. Bokum's objective of making a profit." Diamond, however, did not appear during the trial, and petitioners did not pursue an opportunity to reopen the record and take his testimony in Washington, D.C.
Petitioners have thus made it impossible for the Court to decide this case on the merits. They seek to be relieved in full of the liability determined by respondent, i.e., to secure a windfall of between $ 1.5 and $ 2 million, plus interest, pursuing theories that have repeatedly been rejected in other similar cases and that, in our view, have no merit in this case. They urge "fairness" and "reasonableness, *54 " but neither of those terms characterizes their position. Validity of the Statutory Notice
Petitioners contend that the statutory notice was not valid because, as appears from the deposition testimony of Haas, certain correspondence produced during that deposition, and from the testimony of Haas at trial, examination of Quinta had not been completed at the time the statutory notice was sent to petitioners. Substantially all of petitioners' discovery and most of the evidence they offered at trial related to the processes by which respondent's agents audited the various Geo Group partnerships. Petitioners rely on the testimony of Haas that he did not specifically examine Quinta, did not specifically determine that all losses claimed by Quinta should be disallowed, did not specifically determine that 75 percent of losses would be disallowed, and only prepared the revenue agent's report and audit workpapers for Quinta after the notice of deficiency was sent to petitioners. The significant facts, however, relating to the validity of the statutory notice are that an agent of the Commissioner of Internal Revenue examined petitioners' tax return and sent a notice of deficiency *55 to petitioners in which losses actually claimed on that return were disallowed, tax liability was recomputed using applicable rates and credits after disallowance of that loss, and the year and amount of tax recomputed were set forth in the notice sent to petitioners. Petitioners do not contend that the notice was not sent to their last known address. Thus all of the requirements for a valid notice of deficiency under section 6212 have been satisfied. See, e.g., Olsen v. Helvering, 88 F.2d 650, 651 (2d Cir. 1937), and other cases cited in Benzvi v. Commissioner, 787 F.2d 1541 (11th Cir. 1986), affg. an Order of this Court. Petitioners rely on the opinion of the Court of Appeals for the Ninth Circuit in Scar v. Commissioner, 814 F.2d 1363 (9th Cir. 1987), revg. 81 T.C. 855 (1983), in support of their argument that the notice of deficiency was invalid. In that case, however, there was an express statement on the face of the notice that indicated that the taxpayers' return had not been examined and the tax had been computed using a maximum rate rather than the actual rate applicable to the taxpayers' taxable income. *56 In addition, the notice identified an entity in which the taxpayers had no interest. The significance of these differences was explained by the Court of Appeals for the Ninth Circuit in Clapp v. Commissioner, 875 F.2d 1396 (9th Cir. 1989). In Clapp, the Court of Appeals reviewed the general principles and special circumstances set forth in Scar; reiterated the general rule that courts will not "look behind a deficiency notice to question the Commissioner's motives and procedures leading to a determination" ( Scar v. Commissioner, 814 F.2d at 1368); stated that, in any event, there did not appear to be anything objectionable about IRS guidelines directing the examiner of particular tax shelters to take alternative approaches in view of uncertain judicial response to the issues; and rejected the taxpayers' argument that the failure to consider certain information invalidated the notice. The Court of Appeals stated: The notices of deficiency in the record make absolutely clear that the Commissioner did examine appellants' returns, and did at least consider appellants' deductions. He merely disallowed them. * * * * * * Furthermore, *57 as the Tax Court has since pointed out, Scar did not even require any affirmative showing by the Commissioner that a determination set forth in an alleged notice of deficiency was made on the basis of the taxpayers' return. Only where the notice of deficiency reveals on its face that the Commissioner failed to make a determination is the Commissioner required to prove that he did in fact make a determination. Campbell v. Commissioner, 90 T.C. 110 (1988). Here, nothing on the face of the notice reveals that the Commissioner failed to make a determination. * * * Appellants' argument for greater substantive review of the Commissioner's "determination" mistakes the nature of the notice of deficiency. The notice of deficiency does not result in final liability on the part of taxpayer. If the taxpayer files a petition in the Tax Court, liability will be adjudicated prior to payment. 26 U.S.C. sec. 6213. The notice of deficiency merely hails the taxpayer into court. The Tax Court has as its purpose the redetermination of deficiencies, through a trial on the merits, following a taxpayer petition. It exercises de novo review. See, *58 e.g., Raheja v. Commissioner, 725 F.2d 64, 66 (7th Cir. 1984). Issuing a notice of deficiency is in many ways analogous to filing a civil complaint. [875 F.2d at 1402-1403. Fn. ref. omitted.] The Court of Appeals discussed the alternative remedies available if the determination of the statutory notice is arbitrary, such as shifting the burden of proof and litigation costs, and continued: The existence of remedies for an inaccurate determination of deficiency makes greater substantive review of the Commissioner's "determination" inappropriate. The courts carefully review administrative action for arbitrariness when an agency exercises final, statutory decisionmaking authority, such as an agency rulemaking. In tax cases such as this, the Tax Court or United States District Court review the Commissioner's decision on the merits de novo. Too detailed a substantive review of the Commissioner's threshold "determination," undertaken solely for purposes of exercising subject matter jurisdiction would be duplicative and burdensome on the courts and the Commissioner. [875 F.2d at 1403.] See also Klein v. Commissioner, T.C. Memo. 1989-283. *59 Petitioners attempt to distinguish Clapp on the ground that, in that case, the Court of Appeals referred to the taxpayers' failure to cooperate and provide information during audit. Those circumstances, however, were discussed by the Court of Appeals as a factor to be taken into account with respect to alternative remedies and in comparing the facts to those found in Scar. The Court of Appeals' conclusion that the statutory notice was valid, however, was independent of those facts. In the Memorandum Sur Order attached to our Order dated March 21, 1988, denying petitioners' Motion for Summary Judgment and Motion for Attorney Fees, we stated: The notice of deficiency in this case is dated April 10, 1975, and plainly states that a deficiency of $ 2,570,061.99 for the 1971 tax year has been determined. Attached to the Notice are a Form 3611 which sets forth respondent's computation of the deficiency and a Form 886-A which explains that the deficiency is based upon the disallowance of petitioners' claimed partnership loss for Special Quinta 1971 Drilling Venture. Since the notice unequivocally advises petitioners that a deficiency has been determined and spells out both *60 the year and amount of the deficiency, the notice meets the formal requirements of section 6212; and we conclude that it is valid. We reaffirmed that ruling at the time of trial, and we have no reason to revisit it further. Burden of Proof
Petitioners contend that the notice of deficiency was arbitrary and capricious and that, therefore, respondent should bear the burden of proof in this case. Thus they seek to avoid the frequently stated rule that petitioners always bear the burden of proof as to deductions. See, e.g., New Colonial Ice Co. v. Halvering, 292 U.S. 435 (1934). As stated by the Court of Appeals in Gatlin v. Commissioner, 754 F.2d 921, 923-924 (11th Cir. 1985): This is a deduction case. At all times the taxpayer must come forward with evidence to support his entitlement to the deduction and the amount of that entitlement. See generally Conforte v. Commissioner, 74 T.C. 1160, 1178 (1980); Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir.), cert. denied, 423 U.S. 448, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975). When claiming a deduction, the taxpayer has admitted the *61 full amount of income but seeks to pay less than the applicable tax on that income by utilizing available deductions. Because the taxpayer is privy to the facts that substantiate a deduction, he must bear the burden of proving his right to, and amount of, a claimed deduction. This stricter burden for deduction cases makes sense because unlike unreported income cases the taxpayer is not required to prove a negative. Moreover, when a taxpayer challenges the government's disallowance of part or all of a deduction, the Commissioner's original notice of deficiency and the method of calculation of the deficiency at the administrative level is not evidence in the Tax Court. It has no relevancy with respect to the proceeding. The Tax Court undertakes a de novo review. If the government takes a position against a taxpayer that is not substantially justified and the taxpayer prevails, it is possible that the taxpayer has a remedy for attorney fees under 26 U.S.C. sec. 7430(a). The taxpayer's remedy is not one of burden shifting as sought by appellants in this case. The judgment of the Tax Court is AFFIRMED. After citing Gatlin, petitioners state: *62 It is submitted, however, that in the instant case there are factors of fairness that would not place this burden on the petitioners to substantiate the deductions taken. The substantive facts are not peculiarly within the knowledge of the petitioners. These facts are within the knowledge of the IRS, the SEC, and perhaps AdobeOil and Gas and others of which petitioners are not aware. * * * Petitioners, however, raised hearsay objections to essentially every document found in the files of the IRS, the SEC, and perhaps AdobeOil and Gas. Petitioners' objections were sustained as to the truth of the contents of documents obtained by the IRS from the SEC, such as statements allegedly given by Dauber. Most of the disputed documents were received in evidence for the purpose of showing what Haas had examined, because petitioners' claims that the notice was arbitrary made his actions relevant. Some of the documents were analyzed by respondent's expert and support respondent's disallowance of the claimed partnership loss. Haas testified that he developed several theories justifying total disallowance, i.e., theories including that the partnerships lacked the requisite profit *63 objective. Even if information found in the files of the SEC and the partnership were hearsay for purposes of trial, respondent was entitled to rely on hearsay in sending the notice of deficiency. See Avery v. Commissioner, 574 F.2d 467 (9th Cir. 1978), affg. T.C. Memo. 1976-129. Thus the disallowance of the total amount of the loss claimed was not arbitrary, and it certainly was not capricious. Petitioners also contend that the statutory notice was arbitrary because it was used as a "club" to force petitioners to extend the period of limitations on assessment. A similar argument was raised and rejected in Chaum v. Commissioner, 69 T.C. 156, 163-164 (1977). We stated that "The criterion is not whether petitioners affirmatively interfered with respondent's efforts to make a precise determination but is rather whether respondent's actions were reasonable under all the existing facts." 69 T.C. at 162. In this case also, we conclude that respondent's efforts were reasonable under all of the circumstances. Faced with 52 partnerships and 2,500 partners, respondent was diligently pursuing information necessary to make a reasonable *64 determination. Even assuming that respondent's activities involved delays, imperfect coordination, and inconsistencies, the problems are understandable, and respondent's actions were not unreasonable in view of the enormity of the task facing him. Respondent requested an extension from petitioners, but petitioners refused. In Chaum, we stated: There is also a further reason why the request in petitioners' motion to make a determination as to burden of proof that we determine respondent to have the burden of going forward with the evidence should not be granted. In Halvering v. Taylor, supra, [293 U.S. 507 (1935)] in holding that where a determination of income received by a taxpayer had been arbitrarily made by respondent the entire deficiency should not be sustained merely because the taxpayer did not come forward with evidence to show the proper amount of tax due, the Court pointed out that "the burden is upon the taxpayer to establish the amount of a deduction claimed." This Court has likewise consistently held that the burden is always upon a taxpayer to establish his right to claimed deductions. Roberts v. Commissioner, supra [62 T.C. 834] at 836 *65 [1974]. The Court of Appeals for the Ninth Circuit to which an appeal in this case would lie has followed this same rule. In the recent case of Rockwell v. Commissioner, 512 F.2d 882 (9th Cir. 1975), affg. a Memorandum Opinion of this Court, the Ninth Circuit, after discussing certain of its cases which might indicate that the ultimate burden of persuasion shifted to the Commissioner where a taxpayer had shown that respondent's determination of additional income received by him was erroneous, stated at page 886: Whatever the proper rule may be where inclusion in income is controverted, there is no dispute that the taxpayer bears the burden of proof in substantiating claimed deductions. * * * See also Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 361 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; Clapp v. Commissioner, 321 F.2d 12, 14 (9th Cir. 1963), affg. 36 T.C. 905 (1961), in which the Court categorically stated that "the burden of proving a deductible loss and its amount is always upon the taxpayer." [69 T.C. at 163-164.] See also Beck v. Commissioner, 74 T.C. 1534, 1549 (1980), *66 affd. 678 F.2d 818 (9th Cir. 1982). In Malinowski v. Commissioner, 71 T.C. 1120, 1124-1125 (1979), the taxpayers claimed that their records had been lost by the IRS. Thus they argued that respondent should bear the burden of proof. The Court stated: Rule 1004 of the Federal Rules of Evidence, which specifically deals with the admissibility of secondary evidence to prove the contents of a writing where the original is not available, provides, in relevant part, as follows: Rule 1004. Admissibility of Other Evidence of Contents The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if -- (1) Originals lost or destroyed. All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith; or * * * (3) Original in possession of opponent. At a time when an original was under the control of the party against whom offered, he was put on notice, by the pleadings or otherwise, that the contents would be a subject of proof at the hearing, and he does not produce the original at the hearing; * * * See also *67 4 J. Wigmore, Evidence, ch. 41 (Chadborn rev. 1972); 2 B. Jones, Evidence, secs. 7:12-7:30 (6th ed. 1972). Such rule is applicable in Tax Court proceedings. Sec. 7453; rules 101 and 1101, Federal Rules of Evidence; Rule 143, Tax Court Rules of Practice and Procedure; see generally H. Dubroff & D. Grossman, "The United States Tax Court: An Historical Analysis, Part VI, Trial and Post-Trial Procedure," 42 Alb. L. Rev. 191, 192-204 (1978). Under such rule, the inability to produce a record which is unintentionally lost, whether by petitioner, the Commissioner, or by a third party, alters the type of evidence which may be offered to establish a fact, but the rule does not affect the burden of proving a fact. We have no reason to believe that the IRS intentionally destroyed the BAC records turned over to it. On the record before us, it is not clear who is responsible for the loss of such records; all that we can find is that the records are not now available. The petitioners have cited us to no authority for shifting the burden of proof, and after extensive, independent research, we have found no such authority. Accordingly, we hold *68 that the petitioners retain the burden of proving their BAC stock was section 1244 stock. In this case also, we have found no reason to and decline to relieve petitioners of the normal burden. Petitioners complain that shortly prior to trial in 1989, the Court refused to allow them to pursue additional discovery commenced in 1987. They also complain that respondent's opposition to their Motion for Summary Judgment "further [impeded] petitioners' efforts to prepare for trial." Petitioners acknowledge that they filed the Motion for Summary Judgment as a discovery tool. Finally, they contend that they were not apprised of respondent's contentions with respect to the partnership loss until respondent's trial memorandum was filed in 1989. These contentions by petitioners are totally without merit. First, as indicated above, their discovery was not directed at the merits of the case but at their claim that respondent had not made a determination. Second, summary judgment is not intended to be a discovery tool. See Rule 121. Third, through the litigation of Brountas and related cases, petitioners were well aware of respondent's contentions with respect to the deductibility *69 of the partnership losses as early as 1978. Fairness can only be judged in context. In December 1971, petitioner invested $ 2.1 million with CRC. On his tax return for 1971, he claimed a partnership loss of $ 4,202,345, over twice the amount of the investment. The deficiency in issue, $ 2,570,061.99, is the calculated "tax savings" that petitioners hoped to achieve by the investment. Thus, whether or not Quinta ever made a profit, petitioners were ahead within a few months. Petitioner testified that he terminated his attempts to secure information about the partnership activities when he received a check after the partnership interests were sold to AdobeOil and Gas. Petitioner thought that this event occurred in the late 1970's or early 1980's, but Haas testified that the transfer occurred in 1984. The inference to be drawn from the record is that petitioner claimed tax benefits exceeding the amount of his investment; sought to minimize the time in which the IRS might investigate his entitlement to those benefits; attempted to preclude judicial determination of the merits of the case; and now complains about respondent's attempts to bring this case to a conclusion and the *70 Court's insistence that it be brought to a conclusion without further diversionary tactics. We are unpersuaded that any unfairness resulted to petitioners. Respondent has proceeded on the assumption that this case was identical to Brountas v. Commissioner, supra, or that the tax results should be the same even assuming some factual differences. See Gibson Products Co. v. United States, 637 F.2d 1041 (5th Cir. 1981). Under Rule 142(a), the Court may modify the normal burden of proof. The Court suggested that respondent should bear the burden of going forward to the extent that the final partnership adjustments relating to Quinta, consistent with the approach taken in Brountas , allowed some cash deductions. Respondent has now conceded that petitioners are entitled to their proportionate share of the loss that would have been allowed under that rationale. Fairness requires no more. Equitable Estoppel
In their Motion for Summary Judgment and in their post-trial brief, petitioners contend that respondent is precluded from pursuing the deficiency by reason of equitable estoppel. Their argument is as follows: AdobeOil and Gas purchased the *71 GEO Group with the understanding that the Commissioner would offer a proposed settlement to the limited partners involved. Appeals Officers were given the authority to settle cases pursuant to this understanding. On or about July 11, 1984, petitioners received a letter from Mr. Fader, an Appeals Officer with the IRS. The petitioners had filed a protective claim for refund with the Commissioner with their 1973 tax return for the reason that if the taxpayer in Brountas was successful, the petitioners here would be entitled to a refund. The petitioners also filed a protective claim for refund for the tax year 1974. Enclosed with the letter from Mr. Fader were waiver documents to be signed by the petitioners regarding their 1973 and 1974 tax years. On advice of counsel, the waivers were signed by the petitioners and sent to the IRS. Petitioners understood that these waivers were received by the IRS. The petitioners would not have signed the waivers but for their understanding that the 1971 tax deficiency would be disposed of with no additional taxes owing. Upon signing these waivers, petitioners gave up their rights to refunds for the tax years 1973 and 1974. The *72 only authority relied on by petitioners is Tonkonogy v. United States, 417 F. Supp. 78 (S.D.N.Y. 1976). In petitioners' Motion for Summary Judgment, they contended that the Fader letter referred to above constituted an accord and satisfaction. The Court's Memorandum Sur Order attached to the Order denying the Motion for Summary Judgment stated: We also reject petitioners' attempt to characterize Mr. Fader's letter as an "accord and satisfaction" pursuant to section 7121 and 7122. The letter itself contains no language to support petitioners' allegation. It simply does not constitute a formal written closing agreement, as provided in section 7121, nor is it a compromise pursuant to section 7122. Petitioners now contend that they relied on Fader's letter in waiving claims for refund for subsequent years. Assuming that petitioners relied on communications from respondent in waiving claims for refund for 1973 and 1974, the remedy would be avoidance of those waivers rather than forgiveness of the deficiency for 1971. We do not accept, however, petitioners' claim that they believed that "the 1971 tax deficiency would be disposed of with no additional taxes *73 owing." At the time of the waivers in 1984, Brountas had been decided on appeal in favor of respondent. Petitioner testified that the claims for 1973 and 1974 were protective in case Brountas was resolved favorable to the taxpayers. Thus, they presumably had no value after the taxpayers lost in Brountas. This case had been pending since 1975, and petitioners were represented by counsel. Nothing was done to close out this case. As of the time the Motion to Change the Place of Trial was filed in February 1985, petitioners' former counsel was representing that "agreement has been reached as to the underlying substantive tax issues in this case. The petitioners are prepared to enter into a stipulation with the respondent as to the tax liability due for the years in question." Petitioners offered in evidence at trial copies of Forms 1040X -- their purported claims for refund for 1973 and 1974. Respondent objected on grounds including petitioners' failure to exchange the documents at least 15 days before trial as required by the Standing Pre-Trial Order and the absence of the Forms 1040 that were purportedly being amended. Respondent's objections were sustained. The *74 tendered exhibits, however, reflected claims for refunds of $ 39,569.30 for 1973 and $ 10,161.40 for 1974. It is not credible that petitioners believed that respondent would give up a claim for a deficiency exceeding $ 2.5 million (or $ 1.5 million, which is the amount that petitioners estimated the compromised deficiency to be in their motion to amend the petition filed February 12, 1985) in exchange for waiver of claims totaling less than $ 50,000 (of doubtful validity after Brountas was resolved in favor of the Government). At least two elements of equitable estoppel as applied in Tonkonogy v. United States, supra , are missing, i.e., actual reliance and "a factual context in which the absence of equitable relief would be unconscionable." 417 F.Supp at 79. See also Simmons v. United States, 308 F.2d 938, 945 (5th Cir. 1962); Schuster v. Commissioner, 312 F.2d 311, 317 (9th Cir. 1962). Innocent Spouse
Petitioners contend that Mrs. Bokum is entitled to relief under section 6013(e) as an innocent spouse. To be entitled to such relief, however, among other things, petitioners must show that the partnership *75 loss claimed on the return was grossly erroneous within the meaning of section 6013(e)(2)(A) and (B). Purcell v. Commissioner, 86 T.C. 228 (1986), affd. 826 F.2d 470 (6th Cir. 1987). Under section 6013(e)(2)(B), a grossly erroneous item includes any claim of a deduction in an amount for which there is no basis in fact or law. Grossly erroneous items under section 6013(e)(2)(B) have been equated to deductions that are fraudulent, frivolous, phony, or groundless. Stevens v. Commissioner, 872 F.2d 1499 (11th Cir. 1989), affg. a Memorandum Opinion of this Court. In refusing to stipulate to the facts found by the Court in Brountas, petitioners have contended that their case is different from Brountas. Petitioner testified that the auditor sent by him to look at records in Corpus Christi determined that the general partners had diverted at least $ 150,000 contrary to petitioner's contract with the partnership. Petitioner claimed: They diverted the profits from the drilling prior to when they should have. You see, in Brountas' case, that was not true. I should have had 25 percent more of the income from the wells that *76 were completed and were producing going to pay off what I put in and what my non-recourse loans were. Thus petitioner was contending that the facts of his case were better than those in Brountas. In any event, we cannot conclude that deduction of the loss claimed by Quinta was "grossly erroneous" when the Tax Court sustained those claims in Brountas, petitioners contend that their case is better than Brountas, and respondent has conceded that petitioners are entitled to the same result as that ultimately reached in Brountas. Petitioners also have not proven that the understatement exceeded the percentage of Mrs. Bokum's adjusted gross income for the preadjustment year specified in section 6013(e)(4). We need not decide whether Mrs. Bokum knew or had reason to know of the understatement or whether it would be inequitable to hold her liable for the tax in dispute. Petitioners' Entitlement to Deductions
As indicated above, respondent has conceded that the deficiency should be adjusted to be consistent with the final result in Brountas. We have held that petitioners bear the burden of proof as to deductions. Petitioners have conceded that, if they *77 have the burden of proof, they did not meet that burden and, in support of their argument that Mrs. Bokum is an innocent spouse, have affirmatively asserted that there is no evidence in the record that would support their deductions. No further allowance, therefore, may be made. To reflect respondent's concession, Decision will be entered under Rule 155.